**CARLING BREWING COMPANY, Inc.**

v.

**PHILIP MORRIS, INC.**

**Civ. A. No. 10164.**

United States District Court
N. D. Georgia.
Atlanta Division.
Nov. 22, 1967.

**328**

Cleveland, Ohio, and a substantial manufacturing activity at Atlanta, Georgia. Its business is the manufacture and sale of beer and ale products, and it does not contemplate the production of any other product at this time. Plaintiff's principal product, in terms of sales, is a type of beer which plaintiff contends is known as "Black Label".[1]

2. Defendant, Philip Morris, Inc., is also a Virginia corporation, with a principal place of business at New York, New York. Its primary business is the manufacture and sale of tobacco products, although it manufactures and sells other consumer goods, such as chewing gum and razor blades. Its 1966 Annual Report listed its net sales as $767,473,120 and its assets as $512,549,000. It ranks fourth in sales in the American cigarette market.

3. This is a suit for alleged infringement of a federally registered trademark, and alleged attendant unfair competition created by the defendant's use of the trademark "BLACK LABEL" as a brand name for cigarettes. Jurisdiction is based upon the Trademark Laws of the United States, more particularly upon 28 U.S.C. § 1338, and 15 U.S.C. §§ 1114, 1116, 1119, 1121 and 1125(a).

4. Venue is founded on 28 U.S.C. § 1391(c). Defendant was duly served with process in this District and has made a general appearance herein.

5. This action began on May 24, 1966, when plaintiff alleged that defendant's past and proposed use of the words "BLACK LABEL", as a brand name for a type of cigarette, constituted an infringement of their trademark "Black Label". Plaintiff sought a temporary and permanent injunction against any such use of that mark in connection with tobacco products. Plaintiff also sought damages, an accounting for profits, destruction of all materials possessed by defendant containing the words "BLACK

Richard C. Freeman, Haas, Holland, Freeman, Levison & Gibert, Atlanta, Ga., James L. Dooley, Wm. K. West, Jr., Cushman, Darby & Cushman, Washington, D. C., for plaintiff.

Edgar A. Neely, Jr., Neely, Freeman & Hawkins, Atlanta, Ga., David J. Mountan, Jr., Joyce Daryl Chaikin, Conboy, Hewitt, O'Brien & Boardman, New York City, for defendant.

## ORDER

EDENFIELD, District Judge.

1. Plaintiff, Carling Brewing Company, Inc., is a Virginia corporation, with a principal place of business at

---

[1]. Carling Brewing Company is an almost wholly owned subsidiary of Canadian Breweries, Ltd., a Canadian corporation. A 1967 annual report for the latter company, of which the American subsidiary is a major component, shows net sales of $384,493,000 and total assets of $294,273,288.

LABEL", attorney's fees, and an injunction against defendant's further processing of its then pending application to the Patent Office for registration of the mark "BLACK LABEL" for cigarettes. Numerous affidavits have been submitted by both parties and a full hearing has been held on the motion to grant a temporary injunction against this use of "BLACK LABEL" by Philip Morris. The request for an injunction against the Patent Office proceedings has not been pressed.

6. Trademark Registration Number 308,966 was awarded to a predecessor of plaintiff on December 26, 1933 for use on lager beer, under the Trademark Act of February 20, 1905. This registration was assigned to plaintiff, who had it republished under the provisions of Section 12(c) of the Lanham Act and thereafter duly filed the affidavits required under Sections 8 and 15 of that Act (15 U.S.C. §§ 1058(a) and 1065). This registration states on its face: "No claim is made to the exclusive use of a label colored black." On this label, the words "BLACK LABEL", in block print, were approximately half the size of the word "CARLING'S" above it and the word "LAGER" below. This trademark registration was renewed on December 6, 1953. The required affidavits of use for this registration were filed on or about May 12, 1965, together with a specimen label. This label shows the words "Black Label" in a large script, with the words "CARLING" and "BEER" above and below the words "Black Label" in a print that is approximately one-third to one-fourth as high as the script "l" and "k". This label is the one now used on Carling's bottled beer.

7. In addition, plaintiff is the owner of federal Trademark Registration No. 796,521, registered on September 21, 1965. The specimen covered by this registration shows the words "Black

Label" in a script, surrounded by a series of concentric rectangles with rounded corners. This label is the one now used, with the addition of the word "BEER" (but not the word "CARLING") below the words "Black Label", on the canned beer sold by Carling. This particular arrangement also appears on the cardboard containers used for both canned and bottled beer. This combination ("Black Label" in white and "BEER" in red) appears on a black background, bounded by the afore-described rectangles, which are black lines separated by white spaces. The rectangular label in turn appears against a background of red. In most cases where this mark is used, the word "CARLING" is also printed in either black or white, surrounded by an oval line in the same color, the whole being described as the "Carling racetrack". The "racetrack" usually appears above and to the left of the "Black Label" rectangle. On the whole, the words "Black Label" are the words with the most visual impact in the entire scheme. This registration also stated on its face: "Applicant makes no claim to the exclusive use of a label colored black."

8. Carling Brewing Company is one of the larger American brewing companies, with regional breweries producing Black Label beer scattered throughout the United States. Nationally, it is the sixth largest beer producer, and its rank in markets close to its breweries may be even higher. The company's product is also sold in a substantial number of foreign countries.[2] In addition to Black Label beer, Carling also produces, for regional markets within the United States only, Heidelberg beer, Red Cap ale, and Stag beer. The labels for each of these products contain the Carling "racetrack", either above or above and to the left of the brand name, which is always in substantially larger print.

2. Carling Brewing Company exports Black Label beer directly to a number of countries. In addition, Carling Breweries, Ltd. of Canada produces Black Label beer for sale in that country, and Beamish and Crawford, Ltd., of Ireland, produces

Carling Black Label beer for sale in Ireland. An English associate of Canadian Breweries, Charrington United Breweries, Ltd., produces Carling Black Label for sale in the United Kingdom and also for export.

9. There is a dispute as to the degree to which the words "Black Label" alone are recognized as being the name of a brand of beer. Defendant contends that the beer is known as "Carling Black Label", while plaintiff contends that it is known as "Black Label" alone. There is no direct evidence by survey or otherwise as to which name is currently accepted by the public as the name of the product. The evidence does show that Carling has made a sustained and expensive advertising effort, amounting to at least 50 million dollars in corporation-sponsored advertising alone in the last five years, to popularize Black Label beer under that name.[3] Additional advertising at the numerous points of sale, sponsored or subsidized by Carling to the extent of 12 million dollars over the same period, has repeated the emphasis on the mark "Black Label". Other advertising by distributors and retailers has been consistent with the Carling policy of emphasizing "Black Label". On the other hand, some retailers have advertised Black Label beer by referring to it only as "Carling's" in their advertisements, or with "Carling" given equal or greater importance than the words "Black Label".[4] The evidence shows that Carling's national advertising has, over the last ten years, deliberately shifted its emphasis to the words "Black Label" and

has subordinated "Carling". Therefore, the court finds no inherent conflict between evidence of past and current advertising practices, or the fact that some local advertisers may advertise Black Label without following Carling's lead in emphasizing the name of the beer rather than the name of the company. The ultimate question is not whether *all* the public know Carling's beer as "Black Label", but whether enough of the public recognize Carling's beer as "Black Label" to give Carling a right to protect that mark alone from an infringing use.

■ 10. The court takes judicial notice of the fact that most establishments. that sell beer at retail also sell tobacco products, with the limited exception of so-called package stores in areas where their licenses allow the sale of certain alcoholic beverages only. Further the evidence shows that many retail establishments selling beer for on-premises consumption either use or have available ashtrays and matchbooks bearing the Black Label mark, which have been distributed to the retailers in the course of Carling's publicity activities. Such matchbooks and ashtrays are most commonly used in conjunction with cigarettes. of all types and brands.

11. There is evidence that at the time Philip Morris first used the mark in October, 1965, there were two other uses.

3. Carling's Annual Report shows some 17 brands produced by Carling in America and Canada. In every one of them, "Carling", when it appears, is clearly subordinated to the brand name, suggesting a deliberate corporate policy. This contrasts with some of the other Canadian subsidiaries of Carling which emphasize the name of the minor corporation in one or more of their products.

4. Only the advertisements themselves have been submitted to the court. There has been no testimony on the intent of such retail advertisers. But this type of advertising may support other propositions than the one urged by defendant, which is that the retailers believe the beer is better known as "Carling's". Some of the advertisements subordinating "Black Label" may have been motivated by a desire to get the biggest print possible on

each word so as to fill the space available. Thus, in one ad, "Beer" is much larger than "Carling's", which in turn is larger than "Black Label". In another ad, "Beer" is four times as large as "Carling's Black Label". But the same ad also advertises "Bleach" in print four times as large as "Bright Sail", apparently a particular brand of that commodity, suggesting that the advertising is of a general product, regardless of any brand name. In still another ad, the "Black Label" is subordinated to "Carling" exactly as "White Label", a clear grade indicator, is subordinated to "Philadelphia", a brand of whiskey. This leads one to wonder if the advertiser thought "Black Label" was merely one of a number of different grade marks using this type of nomenclature. In any event, the evidence is, at best, inconclusive as to the intent of the retailers.

of the words "Black Label" as a primary trademark. In one case, it was in use for a hair spray and styling gel that was being sold only to licensed professional beauticians and not to the general public. The trademark application for this product has been amended (on September 15, 1967) to so restrict its use to such an application. A second use was for the words "Black Label" as a registered trademark for certain types of clothing produced by the P. H. Hanes Knitting Company, of Winston-Salem, North Carolina. There is no evidence as to its use in October 1965, and only the barest evidence that it had ever been used at all, and that only during the month of May, 1965.

12. Beyond these two cases where there was a use of "Black Label", there were three other valid registrations of the words "Black Label" as a part of a trademark at the time Philip Morris used it. These were for Johnnie Walker Black Label (a Scotch whiskey), Lanson pere & fils Black Label Champagne, and Yardley's Black Label Cologne.[5]

13. Patent Office records show seven other registrations for the words "Black Label", alone or with other words, all of them dating from the 1923–1937 period, and all of which had expired by 1965. There is no evidence of when they were used or to what extent.[6]

14. In addition to these formally registered marks, at least five other manufacturers of alcoholic beverages use the words "Black Label" on their label, without apparently having registered them.[7]

5. In the case of Johnnie Walker, "Black Label" is clearly a grade mark, used to distinguish the superior grade from the less expensive Johnnie Walker Red Label. On the main label, "Johnnie Walker" is clearly printed in letters twice as large as the grade mark "Black Label", which is printed in a much less readable Germanic print. On the Lanson champagne label, the word "Lanson" is clearly the visually dominant name for the product. That "Black Label" may be a grade mark in this case is evident from the fact that Lanson's makes other champagne, which is only described as extra dry or vintage or non-vintage, as the case may be. The only other evidence before the court affirmatively shows that the public does not conceive of Lanson's as "Black Label Champagne". The third product identified as "Black Label" is a men's aftershave lotion and cologne produced by Yardley & Co., Ltd. A registration was issued for the trademark "Yardley's Black Label" on February 4, 1964. A cancellation proceeding against this use was brought in 1964 by plaintiff Carling Brewing Company, although it is undisputed that it was being used by Yardley in October, 1965. This proceeding is still pending in the Patent Office and no decisions have been rendered yet.

6. Registrations for the words "Black Label" alone were for malt syrup, musical instrument strings, and spool silk. None of these appear to be mass consumption items. Remaining uses, where other words formed part of the registration, were for a whiskey, a carbonated water, a soft-drink syrup, and for both soft drink ingredients and a soft drink beverage. There is no indication of the details of such use or the subordination of any part of the registered mark to any other part.

7. Gallagher and Burton manufacture a blended whiskey with the words "Black Label" clearly subordinated to "Gallagher and Burton". Since Gallagher and Burton also distribute a "White Label", the words "Black Label" are clearly only a grade mark, identifying their lower proof whiskey. One of three types of port wine imported by Robertson Bros. and Co., Ltd. is characterized as "Robertson's Black Label Ruby Port" on the label. "Robertson's" is the visually dominant name. Diego Rallo & Figli import an Italian wine whose label bears the appellation "Imported Rallo Black Label". "Rallo" is clearly the visually dominant word on the label. There is some evidence that Robertson's is sold nationwide; there is no evidence as to how widely Rallo's is sold. Louis Cherpin Winery produces a wine which is sold in Southern California under the label "Cherpin California Burgundy" with the words "Black Label" appearing at the top of the label. These words and the color of the label (black) are a grade mark, to distinguish this product from a "White Label" product sold by the same producer. Finally, Medley Distilling Company, a subsidiary of Renfield Importers of New York, produces a blended whiskey known as "Medley Black Label", with "Medley" being the dominant part of the

15. In addition to these instances where the words "Black Label" appear in the label itself, in one fashion or another, there are at least two other alcoholic beverages which use a label *colored* black to distinguish one grade of their product from another grade.[8]

16. Carling has never objected to the use of the words "Black Label" by any of these parties other than by Yardley, as has been noted.

17. One of the questions on a temporary injunction is whether there is a reasonable probability that the party who may be granted such an injunction will ultimately prevail in the trial of the case. Where trademark infringement is alleged, it is ultimately necessary for the plaintiff to show that there may be confusion between the sponsorship of his product and the sponsorship of another product. As a prerequisite to such a showing in this case, it will be necessary to ultimately show that plaintiff's use of "Black Label" is more than a mere descriptive term. Plaintiff must show that "Black Label" has become identified in the public mind (or at least in the minds of a significant part of the public) with Carling's beer product. After weighing all the evidence submitted on this question, and considering the net impact of other uses of the words "Black Label" against the sustained and concentrated effort of Carling to make this mark synonymous with its beer, the court finds there is even more than a reasonable probability that Carling will ultimately prove this essential element.

18. The elements involved in Philip Morris' alleged infringement are undisputed. A sale of a small number of cigarettes under the label "BLACK LABEL" was made on October 22, 1965. This was sufficient to qualify Philip Morris' use of that mark for an application for a federal trademark registration. Additional sales under that label have also been made, amounting at the present time to some 25,000 cigarettes. The most recent sale was made just prior to the hearing in the case, during the period between June 20, 1967 and July 6, 1967. Apart from the very first sale, all the subsequent sales by Philip Morris were made with actual knowledge that Carling claimed rights in the trademark "Black Label", and that Carling intended to oppose the registration application of Philip Morris.

19. On or about November 4, 1965 the defendant's formal application for the registration of the mark "BLACK LABEL" as a trademark for cigarettes was filed in the United States Patent Office. By office action of the Patent Office dated June 27, 1966, the application was rejected. A response to this office action was filed by the defendant with the United States Patent Office on or about December 23, 1966. By further office action mailed January 31, 1967, the refusal to register the mark "BLACK LABEL" for the defendant herein was made final by the Examiner. On or about July 11, 1967 an appeal was taken from the final office action of the Examiner to the Trademark Trial and Appeal Board of the Patent Office. No decision has been rendered on that appeal. However, the Examiner's final refusal declared:

"The trademark Black Label is very well known for beer and it is not believed proper for a newcomer to start using the mark for such a related prod-

label. While the label is black, there is no evidence that other grades of Medley whiskey are sold, and that the Black Label is therefore only a "grade mark".

8. Jack Daniel's Sour Mash Whiskey, and Evan Williams Sour Mash Whiskey are described, both within the liquor trade and by the buying public in general, as "Jack Daniel's Black Label", as contrasted with "Jack Daniel's Green Label", for instance. Evan Williams is sold, at different proofs, also under both a green and a black colored label. A brandy is also listed in some wholesale catalogues as "Hildick Black Label Applejack". However, there is no evidence of any other similar product put out by Hildick which would require any grade differentiation. Thus it is apparently irrelevant that Hildick is so listed.

uct as cigarettes. Most drinkers of Black Label beer, or of course any beer, would be smoking cigarettes as they drink the beer. The two go hand in hand into the same mouth and it is consequently not seen how consumer confusion as to source could be avoided."

■■ 20. While the various Patent Office decisions referred to are not binding upon this court, they are certainly entitled to the most respectful consideration because of the Patent Office's day-to-day expertise in adjudicating cases wherein the ultimate question decided is the question of "likelihood of confusion" as that term is employed in various parts of the Lanham Act. John Morrell & Co. v. Doyle, 97 F.2d 232 (7th Cir. 1938); Aloe Creme Laboratories, Inc. v. Texas Pharmacal Co., 213 F.Supp. 125 (W.D.Tex.1963), affd. 335 F.2d 72 (5th Cir. 1964). The fact that the Patent Office does not have jurisdiction to determine whether the use of a mark should be enjoined in no way affects the pertinence and applicability of its decisions on the ultimate question of likelihood of confusion. As pointed out by Assistant Commissioner of Patents Leeds in Ex Parte Crown Beverage Corp., 102 U.S. P.Q. 312 (Commr. of Pat. 1954):

> "(2) It is true that a court in a trade mark suit determines the right to use and the Patent Office determines the right to register, but it is also true that in determining the right to register, the Patent Office must necessarily pass upon the right to use. The difference between suits in the courts and in the Office lies not in what is passed upon, but in the action taken. The court in disposing of a trade mark suit, performs a judicial act, i. e., it enjoins or refuses to enjoin further use of the involved mark; whereas, the Patent Office performs an administrative act, i. e., it registers or refuses to register the involved mark." (At p. 314.)

Accordingly, the court recognizes that the Patent Office's rejection of the defendant's application for a federal trade-mark registration constitutes meaningful support for the court's independent judgment on the question of "likelihood of confusion".

21. A factor in weighing the potential confusion that may be created in the mind of the consumer concerning the sponsorship of BLACK LABEL cigarettes is the general current trend of previously specialized American industries to diversify their activities and to engage in production of different types of products. Among these industries is the tobacco industry. To be sure, the question has usually been phrased as to whether the public will think that the new product with the same trademark is manufactured or produced by the owner of the registered trademark that has been in use. Sterling Drugs, Inc. v. Lincoln Laboratories, Inc., 322 F.2d 968, 972 (7th Cir. 1963). Given the general situation where the public is generally unaware of the specific corporate structure of those whose products it buys, but is aware that corporate diversification, mergers, acquisitions and operation through subsidiaries is a fact of life, it is reasonable to believe that the appearance of "Black Label" on cigarettes could lead to some confusion as to the sponsorship of EITHER or both the cigarettes and the beer. Whether the public concludes (if it really draws a specific conclusion) that Carling Black Label Beer may have become connected with Philip Morris, or that Carling may now be putting out cigarettes is immaterial. As the Fifth Circuit Court of Appeals recently noted in Continental Motors Corp. v. Continental Aviation Corp., 375 F.2d 857 (1967), this is a dynamic, developing field of the law, and the court must consider events in the business world and the public inpact of name association.

22. The final factor in any estimate of the likelihood of confusion is the particular manner in which the newcomer proposes to use the mark. The cigarette pack by Philip Morris for BLACK LABEL cigarettes has three colors: red, white and black. The red is the general background, the printing is black on a

white field wherever it appears. Carling uses a red general background, with white printing on a black field. Philip Morris prints "BLACK LABEL" in two lines, while Carling writes the words in script on one line. The word "CIGARETTES" in block capitals appears immediately below "BLACK LABEL" on the one package, just as "BEER" does on the other. A small coat of arms appears above "BLACK LABEL" on the cigarette pack, just as "CARLING'S" appears on the bottled beer label (although not on the can). The basic name "BLACK LABEL CIGARETTES" appears within a thin red line in the shape of a diamond, that in turn is bounded by a white line setting the diamond off from the red general background. The concentric black lines (with white spaces between them) in the shape of a rectangle bounding the phrase "Black Label BEER" have previously been described. The evidence does not disclose any cigarette package now on the market that so closely resembles in general format and visual impact the Carling beer package and label. Carling has not claimed that Philip Morris has in any way attempted to trade on Carling's popularity. Both are major corporations undoubtedly above such tactics. However, the similarity of details is such a remarkable coincidence that the prospects of confusion to the customer have been considerably enhanced.

23. It is this court's conclusion that the defendant's use of the trademark "BLACK LABEL" as a brand name for cigarettes is likely to cause confusion, mistake and deception of those purchasers who are familiar with the plaintiff's long and extensive use of the trademark "Black Label" and widespread advertising and promotion thereof, and who have come to recognize it as a trademark associated with the plaintiff and its product. Further, the court concludes that there is a reasonable probability that Carling will prevail on this point on the ultimate issue. Such confusion would be naturally fostered by the undisputed fact that cigarettes and beer are frequently sold side by side in the same type of establishments, and are similar in function; i. e., non-essential but (to some) pleasant tasting products that are taken in orally. Moreover, as already noted, the plaintiff's "Black Label" mark is the subject of advertising on matches used to light cigarettes as well as on ashtrays which are utilized as a depository for the ashes of cigarettes in bars and restaurants and other places wherein beer is sold and consumed, and this "Black Label" mark bears a remarkable similarity to the manner in which defendant proposes to use the same words on cigarette packs.

24. There are five elements that must be shown by the plaintiff before he may be granted a preliminary injunction in a trademark case:

(1) that he will probably succeed at trial; W. E. Bassett Co. v. Revlon, Inc., 354 F.2d 868 (2d Cir. 1966);

(2) that he is threatened with irreparable injury; W. E. Bassett Co. v. Revlon, Inc.;

(3) that the threatened injury is immediate and real and not merely speculative; Chemical Corp. of America v. Anheuser-Busch, Inc., 306 F.2d 433, 2 A.L.R.3d 739 (5th Cir. 1962); Orchard Bros. v. Rudin, 130 F.Supp. 660 (N.D.N.Y. 1955);

(4) that the various conveniences and injuries to the parties must be balanced as they would be affected by the granting or withholding of the injunction, and the balance found to lie with the plaintiff; Yakus v. United States, 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834 (1944); Kraft-Phenix Cheese Corp. v. Levin, 29 F.Supp. 813 (E.D.Pa.1939);

(5) that the plaintiff's trademark is valid, and worthy of protection, and that it is being infringed by the defendant; W. E. Bassett Co. v. Revlon Inc.

25. There is no question that plaintiff's trademark is valid.

Whether it is worthy of protection depends primarily on the degree to which it may have been diluted by others in the past. The court has found that "Black Label" has acquired such a secondary meaning as applied to Carling's beer product that Carling's right to use that mark should be protected. And although beer and cigarettes are not directly competing products, there is no longer any such requirement as a prerequisite to an injunction against a trademark infringement. Continental Motors Corp. v. Continental Aviation Corp., supra. Each case must be judged on the facts peculiar to it alone, and previous cases on different facts are never controlling in trademark actions. On balance, the court finds that Philip Morris' use of "BLACK LABEL", under all the circumstances involved here, would be an infringement on Carling's use of the same mark.

26. While further evidence will undoubtedly be submitted, and the final decision may be some time off, the facts now before the court indicate a reasonably strong probability that Carling will ultimately prevail in its request for a permanent injunction. This indicates no pre-judgment of evidence not now before the court. Philip Morris has informally indicated that they are having a survey done to show the extent (or lack of it) of public identification of "Black Label" with Carling's beer. Carling has advised that if the survey is contrary to their position, they will wish to have a survey also.[9] Other evidence may well be submitted. When it is, it will be cumulative of evidence already before the court and may tip the balance against Carling. However, the court considers that Carling has made out such a strong showing that Philip Morris is now under a burden to rebut it.

27. As to whether the damages to Carling may be irreparable, the court concludes they may well be. While the defendant urges, and this is not disputed, that it is well able to respond to any award of damages made at trial, it does not follow that such financial responsibility provides an immunity from a temporary injunction. As noted by the Court of Appeals:

"It is difficult for the owner of a trademark to prove the amount of his damage or how much of it is caused by the infringement. To authorize preventive relief through the issuance of an injunction proof of actual damage is not necessary, but the likelihood of damage is sufficient." Pure Foods v. Minute Maid Corp., 214 F.2d 792, 797 (5th Cir. 1954).

Here the plaintiff has demonstrated a likelihood of damage, but the same proofs demonstrate that it is *unlikely* that the plaintiff will ever be able to prove any *measure* of damages that would support an award. Accordingly, the defendant's proof of financial responsibility does not militate against a temporary injunction. The fact that the plaintiff will, as a practical matter, probably be unable to muster any acceptable proofs as to the measure of damages that it may have sustained serves to highlight the manner wherein the infringement of a trademark is, by its very nature, an activity which causes irreparable harm—irreparable in the sense that no final decree of a court can adequately compensate a plaintiff for the confusion that has already occurred. The defendant argues that it has an "untarnished reputation for fair dealing and honesty" and that its products are "noted for their high quality", and on this basis urges that its infringement cannot cause any real or meaningful injury. Granting that the defendant has such a reputation, and that their products have such a quality, the rule remains:

"It is not to be disputed that the plaintiff is not required to put its reputation in defendant's hands, no matter how capable those hands may be." James Burroughs, Ltd. v. Ferrara, 8 Misc.2d 819, 169 N.Y.S.2d 93,

---

9. What weight these surveys ought to have under such conditions is not entirely obvious to the court.

(Sup.Ct., N.Y.County 1957) (also reported at 115 U.S.P.Q. 290).

This rule traces back to Judge Learned Hand's famous pronouncement in Yale Electric Corp. v. Robertson, 26 F.2d 972 (2d Cir. 1928), which affirmed an injunction against the use of the famous YALE lock trademark on flashlights:

"However, it has of recent years been recognized that a merchant may have a sufficient economic interest in the use of his mark outside the field of his own exploitation to justify interposition by a court. His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. *This is an injury, even though the borrower does not tarnish it,* or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful." (At p. 974) (Emphasis added.)

28. Moreover, while it is not disputed that some of the defendant's more popular cigarettes are of a high quality, there is nothing in the record to suggest that *all* of the defendant's products now meet any particular standards, much less that they will in the future. In this respect it is significant that up to the date of the hearing on this motion the defendant steadfastly refused to volunteer any information concerning the nature and quality of the "BLACK LABEL" cigarettes that it was planning to produce in larger quantities in the future. The fact that the plaintiff was, even in the midst of a lawsuit, unable to obtain any information about the nature and quality of the cigarettes to be sold under the infringing mark serves to highlight one aspect of the irreparable harm that flows from *any* infringement of a trademark—i. e., the inability of the trademark owner to exercise control over the nature and quality of the goods which are being sold, or are to be sold, under *his* trademark. Discussing this type of damage, Judge Learned Hand held that the injury:

"* * * is real enough, even when the newcomer has as yet done nothing to tarnish the reputation of the first user. Nobody willingly allows another to masquerade as himself; it is always troublesome, and generally impossible to follow the business practices of such a competitor closely enough to be sure that they are not damaging, and the harm is frequently done before it can be prevented." S. C. Johnson & Son v. Johnson, 116 F.2d 427 (2d Cir. 1940).

The law's continuing concern about the effect of infringement on the reputation of the mark, and upon the reputation of its lawful owner, has also been explained in the following terms:

"His mark is the brand by which his goods can be identified, and when it is used by another the reputation of his mark, and consequently his own business reputation, are placed to that extent beyond his control." Standard Brands v. Smidler, 151 F.2d 34, 37 (2d Cir. 1945).

29. Subsequent to the hearing on the present motion, the defendant offered a statement, submitted *in camera,* which disclosed, for the first time, the specific nature of the cigarette that it proposes to sell under the "BLACK LABEL" trademark in the future if such action is not enjoined. It is not necessary to here set out the characteristics of that particular cigarette. Suffice it to say that it is conceded that it is designed to be substantially different, in terms of appeal, from any cigarette on the market. (It should be made clear that no "health" claims are made in connection with the proposed new cigarette, and that its packages also bear the now familiar warning: "Caution: Cigarette Smoking May Be Hazardous to Your Health.")

30. Conceivably, defendant's new product may have a wide appeal to some

persons. On the other hand, it is equally possible that some persons may be repelled by it. Both situations could occur simultaneously. The situation is legally similar to that considered in Javar Coffee Co. v. Joseph Martinson & Co., 142 F. Supp. 423 (S.D.N.Y. 1956), wherein the court issued a preliminary injunction against the use of an infringing mark on a new and unusual blend of coffee, which included an appetite killing substance, and hence had a highly debatable and speculative public appeal.

31. That the danger of use by Philip Morris is immediate and not merely speculative may be shown by several factors. First, throughout this litigation Philip Morris has continued to make sales of cigarettes in a "BLACK LABEL" box, although these are not the particular type of cigarettes previously described and which it eventually intends to market in this fashion. Substantial sales were made within a week of the initial hearing on this question. These sales, far in excess of that required to substantiate their application for trademark registration, have continued despite two findings by the Patent Office that confusion would result if such a registered trademark were in use and despite the instigation of this action by Carling. Whatever may have been Philip Morris' legal right to make these sales, the record shows such a lack of concern for the effects of their actions on others that there is no reason to believe that Philip Morris would voluntarily restrain itself from further action until the conclusion of this action. Further, defendant has fully admitted that it intends to continue to use "BLACK LABEL" while its appeal before the Patent Office is pending. Even if the trademark registration appeal is denied by the Trademark Trial and Appeal Board, or some other court, this would not eliminate Philip Morris' right to use the mark without registration. Since defendant has consistently argued that use is different from registration, it is reasonable to believe that only action by this court will prevent such use.

32. And finally, as to the balance of equities among the parties, the court finds they lie almost wholly with Carling. The actual damage to Philip Morris that may flow from granting a temporary injunction is small. At most, if Philip Morris finally prevails, their marketing plans may have been deferred for a few months. In the meantime, their program to test the acceptability of the actual cigarette to be used in the "BLACK LABEL" box may proceed. Philip Morris produces a number of other products, and there is absolutely no evidence that current sales of "BLACK LABEL" cigarettes are vital or even slightly important to their corporate health. On the other hand, Black Label beer is Carling's primary product. Any action that could adversely affect their sales of Black Label beer would be directly reflected in Carling's profits and the dividends of their stockholders. Granting an injunction merely requires Philip Morris to stand still temporarily, without incurring any significant loss. Denial of the injunction may cause harm to Carling which could take years to repair. In an industry as competitive as the beer industry, in an age of increasing concentration of all industry, such damage could be fatal.

33. It therefore appears to the court that the plaintiff has demonstrated that it is entitled to a preliminary injunction against any further use of the trademark "Black Label" on, or in association with, any tobacco product.

34. The question having been disposed of under the Lanham Trademark Act, it is not necessary to consider the Anti-Dilution Statute of Georgia or of other states, or other possible theories advanced by the plaintiff.

For the written reasons this day assigned, the following order is hereby entered and issued:

ORDER

It is ordered, adjudged and decreed that the defendant, its agents, officers, employees, and successors, and all those in active concert and participation with it, be and they are hereby temporarily

enjoined from further acts of distributing or advertising any tobacco products under the trademark "BLACK LABEL", either by sale or gift or in any other manner. Such distribution as is now in process and which is under the control of defendant shall cease, and defendant is hereby ordered to exercise its best efforts to regain possession of such articles bearing the trademark "BLACK LABEL" as may have been distributed to wholesalers, retailers or others which have not yet reached the hands of ultimate consumers. This order shall remain in force until the determination of the pending litigation in this court, or until further modified.

This order shall be effective upon plaintiff's filing with the Clerk of this court a proper surety bond in the amount of $5,000.00, which sum shall be available to compensate the defendant in part for costs and damages which it may suffer if it shall develop that this injunction was improvidently granted. Provided, that such sum shall in no event constitute liquidated damages.