**CHEMLAWN SERVICES CORPORATION, a corporation of Ohio CL Licensing Corporation, a corporation of Delaware**

**v.**

**GNC PUMPS, INC., R. Gary Palmer.**

**C.A. No. H–86–1693.**

United States District Court, S.D. Texas, Houston Division.

Feb. 3, 1987.

Thomas W. Flynn, Biebel, French & Nauman, Dayton, Ohio, Stephen H. Cagle, Arnold, White & Durkee, Houston, Tex., for plaintiffs.

Donald H. Fidler, Houston, Tex., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CARL O. BUE, Jr., District Judge.

### I. *Introduction*

This cause of action was originally brought by Chemlawn Services Corporation and CL Licensing Corporation. Chemlawn Corporation was thereafter added as a co-plaintiff. The action charges Defendants GNC Pumps, Inc. and R. Gary Palmer with infringement of United States Patent No. 4,083,497 and United States Design Patent No. 238,671, and with unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and common law unfair competition. The Plaintiffs base their unfair competition allegations on their claim of protectible trademark rights in the configuration of a spray gun.

On June 4, 1986 the Plaintiffs filed their Motion for Preliminary Injunction Under Rule 65 Federal Rules of Civil Procedure. The motion for injunctive relief filed by the Plaintiffs was based on their claim that the Defendants had engaged in unfair competition under § 43(a) of the Lanham Act. Subsequently, on June 16, 1986, the Defendants filed their Motion to Dismiss the allegations by Plaintiffs that Defendants had violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and that Defendants were liable under common law unfair competition.

The Court held an evidentiary hearing on both motions on October 9, 1986, and the present findings of fact and conclusions of law are based upon the pleadings and exhibits filed in this case, the testimony of witnesses and exhibits introduced into evidence during the hearing, and the arguments of counsel.

The Court found that the Plaintiffs' Motion for Preliminary Injunction should be granted.

### II. *Findings of Fact*

A. Parties To This Action

1. Plaintiff CL Licensing Corporation is a Delaware corporation and the owner of record of the patents made the basis of the

instant lawsuit. (Defendants' Exhibits 4, 13, 14).

2. Plaintiff Chemlawn Services Corporation is a corporation of Ohio and the exclusive licensee of the patents in suit with the right to bring suit for infringement in its own name. (Defendants' Exhibits 4 and 15).

3. Plaintiff Chemlawn Corporation is a corporation of Ohio, and through its wholly-owned subsidiary, CL Investments Corporation, owner of all stock in Plaintiffs CL Licensing Corporation and Chemlawn Services Corporation. (Defendants' Exhibit No. 4).

4. Defendant GNC is a corporation of Texas having a place of business in Houston, Texas. Admission of Fact.

5. Defendant Palmer is the registered agent of Defendant GNC, its president, principal stockholder and incorporator, and resides in Houston, Texas. Admission of Fact.

B. History—Background

6. Chemlawn was founded in 1969 for the business of providing professional lawn care to homeowners and others. (Testimony of Miller).

7. In performing these services Chemlawn applied various liquid products to lawns utilizing spray guns for the purpose of providing professional lawn care to homeowners and others. (Testimony of Miller).

8. Chemlawn Corporation initially used a homemade spray gun in its lawncare services. However, the homemade gun was replaced by a commercially available spray gun known as the John Bean spray gun. (Testimony of Miller; Plaintiffs' Exhibit No. 1; Defendants' Exhibit No. 3).

9. The John Bean spray gun was used by Chemlawn Corporation for approximately five to six years. Subsequently, the Equipment Research Center of Chemlawn Corporation developed a gun to be used specifically for the spraying of lawns. (Testimony of Miller; Plaintiffs' Exhibit No. 2).

10. This gun was replaced in 1976 after approximately a year and a half by another spray gun designed by the Equipment Research Center of Chemlawn Corporation, which is referred to herein as the "Chemlawn Gun." (Testimony of Miller; Plaintiffs' Exhibit No. 3).

11. The Chemlawn Gun has been used as the primary lawn spray gun of Chemlawn Corporation and its operating subsidiary Chemlawn Services Corporation from the date of its introduction to the present without any appreciable change in exterior configuration. (Testimony of Miller).

12. Following introduction and use of the Chemlawn Gun, Chemlawn Corporation service personnel experienced losses of the Chemlawn Guns from their service trucks. Various competitors of Chemlawn Corporation began requesting that Chemlawn Corporation sell them Chemlawn Guns. Mr. Gene Probasco, Vice-President of Lesco, Inc., suggested to Miller of Chemlawn Services Corporation that there be an arrangement whereby Lesco would market the Chemlawn Gun to competitors of Chemlawn. (Testimony of Miller and Probasco).

13. Lesco, Inc. is a company which manufactures and sells equipment, products, and chemicals to the lawn care industry. (Testimony of Miller).

14. In response to the request for Chemlawn Guns, Chemlawn Corporation entered into an oral arrangement in 1978 with Lesco, Inc. Pursuant to the arrangement with Lesco, Inc., Chemlawn Corporation sold Chemlawn Guns to Lesco for resale by Lesco, primarily to competitors of Chemlawn, golf course maintenance personnel and others engaged in lawn and turf care. (Testimony of Miller; Testimony of Probasco).

15. Prior to the introduction and use of the Chemlawn Gun by Chemlawn Corporation in 1976, Dr. Miller was of the opinion that there was not another acceptable lawn spray gun. (Testimony of Miller; TR 62, 63).

16. Among such other guns, in addition to the John Bean spray gun, are a metal

spray gun made in Taiwan, a No. 46 spray gun made by Spraying Systems Company, a Model JD9–C spray gun marketed by Encap Products Company under the trademark Green Garde, and a variation of Spraying Systems Company No. 46 gun which is equipped with an elongated spraying boom. All of the above described guns except for the John Bean Spray Gun and the No. 46 gun are for trees or shrubs. (Testimony of Miller; Plaintiffs' Exhibit Nos. 1, 4, 5, 6 and 7; Defendants' Exhibit No. 3; TR 66–69).

17. The Chemlawn Gun is distinctive in appearance, particularly when compared to these other spray guns and its own earlier developed spray gun for a number of reasons, including the fact that:

a) It is made of plastic whereas the others, except for its own earlier gun, are made of metal;

b) The trigger on each of the others is pivoted at the top, while the trigger of the Chemlawn Gun is pivoted at its bottom;

c) The Chemlawn Gun is different in size and shape from the other spray guns;

d) The nozzle on the Chemlawn Gun is different in shape from the nozzles on the other guns, with the exception of the No. 46 Spraying Systems Company gun, which utilizes a CHEMLAWN nozzle. The CHEMLAWN nozzle has a series of longitudinally extending ribs, an enlarged flange at its downstream end and a dome-shaped section with numerous perforations through which the liquid is ejected from the spray gun;

e) The Chemlawn Gun has a parallelogram formed on the lower left-hand side of its handle, and such parallelogram does not appear on the handles of the other guns;

f) The Chemlawn Gun has a locking device which is mounted in the upper end of the trigger of the Chemlawn Gun for sliding movement, while the locking devices of the other guns are totally dissimilar in appearance and operation;

g) The Chemlawn Gun has a removable cover plate on its handle which approximates the shape of the left-hand side of the handle. It has a rectangular portion which projects upwardly into the barrel where it joins the handle and a second rectangular portion which projects transversely across the base or butt of the handle. None of the other guns have a removable cover plate, let alone a cover plate of the same or a similar size or configuration to that of the Chemlawn Gun;

h) The cover plate of the Chemlawn Gun is attached to it by four screws, two of which are placed just beneath the point where the handle joins the barrel, one of which is placed at the lower rear corner of the handle and the fourth of which is positioned near a forward edge of the handle above the point of attachment of the trigger to the handle. No such pattern of screws appears on the other guns.

(Testimony of Miller; Plaintiffs' Exhibits Nos. 1, 2, 3, 4, 5, 6 and 7; Defendants' Exhibit No. 3).

18. When originally introduced by Chemlawn Corporation, the Chemlawn Gun was a material Nylon or off-white color. Sometime subsequent to its introduction the color was changed to a solid white color, and Chemlawn Corporation, through its Chemlawn Services subsidiary, continued to use a solid white colored Chemlawn spray gun. (Testimony of Miller; Testimony of Probasco).

19. The natural Nylon colored Chemlawn Gun originally used by Chemlawn Corporation carries the notation "Chem-Lawn Corp." in letters and numerals approximately one-sixteenth inch high. (Testimony of Miller; Plaintiffs' Exhibit No. 3).

20. In 1985 Gene Probasco, a Vice President of Lesco, approached Dr. Robert W. Miller, a Vice President of Chemlawn Services, and asked if the Chemlawn Guns that Lesco purchased in the future could be made green in color and carry the name "Lesco" where "Chemlawn Corp." had previously appeared. Probasco explained to

Miller that representatives of Lesco felt that competitors of Chemlawn Corporation would be more willing to use the Chemlawn Gun if it was not identical in color to the gun used by Chemlawn Services. Additionally, it was perceived that competitors of Chemlawn Corp. and/or Chemlawn Services would be reluctant to have equipment which could be observed by their customers and which carried the name of their competitor, Chemlawn Corporation. Permission was granted and the Chemlawn Guns thereafter sold to Lesco were colored green and carried the Lesco name on the handle. (Testimony of Miller; Testimony of Probasco; Defendants' Exhibit No. 1).

21. Currently, Chemlawn Services, its competitors and golf course maintenance personnel and others in the Green Industry use Chemlawn Guns in three different colors; namely, natural Nylon, white and green. (Testimony of Miller; Testimony of Probasco).

22. The Chemlawn Gun, regardless of whether it is manufactured in natural Nylon, white or green, is recognized by the Green Industry as the Chemlawn Gun and is referred to by those in the Green Industry as the Chemlawn Gun. When the Chemlawn Gun has been advertised and sold by Lesco, it had been identified as a Chemlawn Gun or patented Chemlawn Gun. (Testimony of Miller; Testimony of Probasco).

23. In approximately 1981 Chemlawn Corporation was approached by FMC Corporation ("FMC") to explore the possibility of FMC's manufacturing tanks and truck beds for Chemlawn Corporation and also for possible production and marketing by FMC of the Chemlawn Gun. Miller, Defendant Palmer and others participated in the negotiations. (Testimony of Miller; Testimony of Palmer).

24. Subsequent to the meetings and in connection therewith, FMC requested that Chemlawn Corporation send FMC the Chemlawn Guns in different colors, particularly a red color which is a standard color for FMC's products. (Testimony of Miller).

25. In response to the request by FMC, Chemlawn Corporation made up Chemlawn Guns in various colors, including pale green, orange, black and red, and sent some of the spray guns to FMC. (Testimony of Miller; Testimony of Palmer).

26. The variously colored guns sent to FMC were never returned to Chemlawn. (Testimony of Miller).

27. Subsequent to the meetings with FMC, Gene Probasco of Lesco, Inc. observed the remaining variously colored Chemlawn Guns which had not been sent to FMC in the office of Dr. Miller. Probasco requested permission from Miller to borrow the Chemlawn Guns for use at Trade Shows as "attention getters." (Testimony of Miller; Testimony of Probasco).

28. Probasco subsequently displayed the variously colored Chemlawn Guns at Trade Shows, where they were recognized as Chemlawn Guns, despite their different colors, including pale green, orange, black and red. The showing of the variously colored Chemlawn guns generated interest on the part of attendees at the show in purchasing Chemlawn Guns in different colors. (Testimony of Miller; Testimony of Probasco).

29. The representatives of Lesco, Inc. foresaw a tremendous inventory problem if Chemlawn Guns were sold in custom colors. Therefore, Lesco, Inc. decided not to offer Chemlawn Guns in different colors. (Testimony of Probasco).

30. The Chemlawn Gun is recognized as such by members of the Green Industry. (Testimony of Miller).

31. Third party suppliers to the Green Industry, in advertising their products often display Chemlawn Guns to illustrate the application of their products, and Green Industry Trade Journals picture Chemlawn guns in illustrating articles of interest to the Green Industry. (Testimony of Miller; Testimony of Probasco; Plaintiffs' Exhibits Nos. 10, 11, 12, 13, 14 and 15).

32. While employed by FMC, Defendant Palmer owned a lawn care business, and he purchased from FMC for use in his lawn care business Chemlawn Guns which had been shipped to FMC in connection with

negotiations between Chemlawn and FMC. (Testimony of Palmer).

33. Defendant Palmer has lived in Brazil, speaks the language and has extensive business contacts in Brazil. Palmer also has maintained both a business and personal relationship with a Brazilian company known as Aflon. (Testimony of Palmer).

34. Dan Rusu and Defendant Palmer participated in discussions concerning Aflon's manufacturing for the Defendants a plastic spray gun to compete with the Chemlawn Gun. (Testimony of Palmer).

35. At one such meeting between Defendant Palmer and Dan Rusu at Palmer's residence, Palmer told Rusu that Defendants wanted a plastic lawn care spray gun to compete with the Chemlawn Gun and gave Rusu a Chemlawn Gun which Palmer had used in his lawn care business. Rusu took this Chemlawn Gun back to Brazil. (Testimony of Palmer).

36. It was decided that the spray gun that the Brazilian company, Aflon, would manufacture for Defendants would have some parts interchangeable with parts on the Chemlawn Gun. (Testimony of Palmer).

37. Both Defendants and Aflon were concerned about a possible conflict with Chemlawn regarding the Chemlawn Gun. (Testimony of Palmer).

38. Defendants did not seek legal counsel with respect to any concerns they had about the Chemlawn Gun. (Testimony of Palmer).

39. Aflon now manufactures and has supplied to Defendants a plastic lawn spray gun which Defendants advertise as the "Mag-P" spray gun. (Testimony of Palmer; Plaintiffs' Exhibit No. 8).

40. The MAG–P spray gun is red in color and is similar, if not the same shade of red, to the red Chemlawn Guns previously supplied to FMC by Chemlawn Corporation and the red Chemlawn Guns displayed by Lesco at Trade Shows. (Testimony of Palmer; Plaintiffs' Exhibit Nos. 8, 9).

41. The Mag-P gun contains the legend on the lower left-hand side of its handle "Made in Brazil by Aflon for GNC", with the letters "GNC" being approximately one-eighth inch in height and the remaining letters being somewhat smaller. (Plaintiffs' Exhibit No. 8).

42. In comparison with the Chemlawn Gun, the Mag-P gun has the following differences:

(a) The rear end of the barrel of the Mag-P gun is beveled, whereas the rear end of the barrel of the Chemlawn Gun is not beveled; (Testimony of Miller, TR 38)

(b) The barrel of the MAG–P gun is straight with a flange on the end, whereas the barrel of the Chemlawn Gun is straight for about half the way and then tapered to the nozzle; (Testimony of Miller; TR 37)

(c) The nozzle of the Chemlawn Gun has a bevel on it, whereas the nozzle of the MAG–P gun does not have a bevel. The MAG–P nozzle is slightly longer; (Testimony of Miller; TR 38)

(d) The longitudinally extending ribs on the nozzle on the MAG–P gun increase in height toward the outlet end of the nozzle, while the longitudinally extending ribs of the nozzle of the Chemlawn Gun are of uniform height throughout their length; (Testimony of Miller; TR–38)

(e) The dome-shaped outlet end of the MAG–P nozzle is somewhat pyramidal in shape, while the dome-shaped outlet of the Chemlawn nozzle is more smoothly curved. The Chemlawn nozzle is larger in diameter; (Testimony of Miller; TR 38) and

(f) The hole patterns in the dome-shaped portions of the MAG–P and Chemlawn Guns are differently arranged. (Testimony of Miller; Testimony of Palmer; Plaintiffs' Exhibit Nos. 3 and 8).

43. The similarities between the Chemlawn Gun and the Mag-P gun are as follows:

a) Both guns are approximately the same size and shape;

b) Both are made of plastic;

c) Both utilize a white, bottom pivoted trigger;

d) Both triggers have slidable locking mechanisms on their upper ends;

e) Both guns have a removable cover plate on the left-hand side of their handles which are nearly identical in shape, including an upper rectangular portion that projects up into the barrel where it joins the handle and a lower rectangular portion that extends across the base or butt of the handle;

f) The cover plates on both guns are attached to the guns by four screws that are positioned in identical irregular patterns;

g) The lettering that appears on the lower left-hand portions of the handles of each of the guns is outlined in a raised rim of parallelogram shape of nearly identical dimensions;

h) The nozzles on each of the guns have eight longitudinally extending ribs;

i) The downstream ends of the ribs terminate in an outwardly projecting annular flange;

j) Each of the nozzles utilizes a dome-shaped section through which are formed the several outlet openings.

(Testimony of Miller; Plaintiffs' Exhibits Nos. 3 and 8).

44. There have been no instances of actual confusion between Defendants' Mag-P guns and Chemlawn Guns. (Testimony of Miller; TR 119).

45. The Mag-P gun and the Chemlawn Gun are both professional spray guns intended for use by professionals in the lawn care industry or Green Industry and therefore are similar products. (Testimony of Miller; TR 119).

46. The Mag-P gun and the Chemlawn Guns are nearly identical in size and shape and thus are similar in design. (Testimony of Miller; Testimony of Probasco).

47. The Mag-P gun and the Chemlawn Gun are sold through similar outlets. (Testimony of Miller; Testimony of Probasco).

48. The primary purchasers of the Mag-P gun and the Lesco gun are professionals in the lawn care industry or Green Industry, and there is, therefore, a similarity of purchasers. (Testimony of Miller).

49. The Mag-P Gun and the Chemlawn Gun are advertised through similar advertising media. (Testimony of Miller; Testimony of Probasco; Testimony of Palmer; Plaintiffs' Exhibit No. 9).

50. The Chemlawn Gun has been used by Chemlawn Corporation and Chemlawn Services, its subsidiary and others throughout the lawn care industry or the Green Industry continuously with the same distinctive external configuration for over four years. (Testimony of Miller).

51. The Chemlawn Gun had a distinctive external appearance unlike any other spray gun on the market at the time of its introduction in 1976 and through the ensuing ten-year period until the introduction in 1986 of the Mag-P gun. (Testimony of Miller).

52. Defendants have no investment in the tooling for the Mag-P gun. (Testimony of Palmer).

53. Defendants have only a small inventory of Mag-P guns on hand. (Testimony of Palmer).

54. Defendants have no contractual commitments beyond their present purchase order of 2,000 spray guns to buy additional MAG–P guns from their manufacturer and no agreement obligating Defendants to purchase additional guns from the Brazilian manufacturer. (Testimony of Palmer; TR 112–113).

55. Defendants have no commitments beyond their present purchase orders to buy additional Mag-P guns from their manufacturer and no agreement obligating Defendants to purchase additional guns from the Brazilian manufacturer. (Testimony of Palmer).

56. The Mag-P gun is just one of over twenty items listed in Defendants' catalog, excluding replacement parts for some of these items, and it constitutes, therefore, only a small part of Defendants' product line.

57. The Chemlawn Gun has a distinctive exterior appearance.

58. Lawn care professionals within the Green Industry have come to associate the

external configuration of the Chemlawn Gun with Chemlawn Corporation.

59. While certain features of the Chemlawn gun have functional purposes, such features are not solely functional and thus also serve to distinguish the appearance of the Chemlawn Gun from other spray guns available.

60. Aside from any functional aspects of any individual elements of the Chemlawn Gun, its overall appearance is distinctive.

61. The fact that Defendants' Mag-P gun is red in color does not serve to distinguish it from the Chemlawn Gun, which has been sold and used in three different colors and displayed at Trade Shows in four additional colors, so that purchasers would very likely believe that the red Mag-P gun is, in fact, a Chemlawn Gun available in another color.

62. With respect to the digits of confusion test, seven of the eight digits of confusion applied by the courts of this and other circuits are present here.

63. The one digit of confusion that has not been proven, actual confusion, may be reasonably explained by the fact that the Defendants' gun has only been on the market for a short period of time and has only been sold in limited quantities.

64. The first digit of confusion, intent of the Defendants, was proved by admissions of Defendant Palmer made during the presentation of evidence at the hearing on Plaintiffs' Motion For Preliminary Injunction:

(a) that he was familiar with the Chemlawn Gun, both as a result of his employment of FMC and through use of the Chemlawn Gun in his own lawn care business;

(b) that he had a Chemlawn Gun in his possession and gave it to a representative of Aflon and advised him that Defendants wanted a plastic spray gun to compete with the Chemlawn Gun; and

(c) that Defendants decided that their Mag-P gun would have parts interchangeable with parts of the Chemlawn Guns.

65. Additionally, the similarity between the Mag-P gun and the Chemlawn Gun is indicative of a conscious effort to copy the Chemlawn Gun as closely as possible. The gun produced by Defendants in concert with Aflon is nearly identical in size and shape to the Chemlawn Gun.

66. The second digit of confusion is similarity of design, and this digit is satisfied by the fact that the two guns are nearly identical in size and shape.

67. The third digit of confusion is actual confusion. Although there does not appear to have been actual confusion, this may be reasonably explained by Defendants' relatively small quantity of Mag-P guns sold.

68. The fourth digit of confusion is similarity of product, and this digit is considered satisfied by the fact that both products are professional spray guns used primarily in the professional lawn care business or Green Industry.

69. The fifth digit of confusion is similarity of outlets. In the present case, the evidence presented showed that the same types of outlets would handle both the Chemlawn Gun and the Defendants' gun.

70. The sixth digit of confusion is similarity of purchasers. In the present case, the purchasers of both the Chemlawn Gun and the Defendants' gun are lawn care professionals or professionals in the Green Industry.

71. The seventh digit of confusion is similarity of advertising media for the products. In the instant action, the evidence presented showed that in at least one instance the advertising media has been shown to be identical.

72. The eighth digit for consideration is the strength of the work involved. In the present case the extensive, exclusive and continuous use of the same configuration for the Chemlawn Gun for over a decade with little change in exterior appearance other than changes in color has resulted in the Chemlawn Gun being associated with Chemlawn Corporation throughout the Industry. As such, the configuration of the

Chemlawn Gun is a strong indicia of origin and a mark of considerable strength.

### III. *Conclusions of Law*

1. The Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. §§ 1332, 1338(a) and (b), and 15 U.S.C. § 1121. Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) and 28 U.S.C. § 1400(b).

■ 2. Chemlawn Corporation, Chemlawn Services Corporation, and CL Licensing Corporation are the proper parties to maintain this suit based on Count III of the Complaint in that Chemlawn, through its wholly-owned subsidiary CL Investments Corporation, owns all of the stock in all of the subsidiary Chemlawn corporations. The Court need not determine whether any rights in the configuration of the Chemlawn Gun are in some subsidiary of Chemlawn other than CL Licensing or Chemlawn Services.

3. However, insofar as any transfer of title to rights in the exterior appearance of the Chemlawn Gun was made to a subsidiary during the reorganization of September 1984, such title was transferred to CL Licensing Corporation as part of the transfer to it for "patents, trademarks, licenses and similar intangible property."

### IV. *Propriety Of A Preliminary Injunction*

4. A preliminary injunction is an equitable remedy available at the sound discretion of the district court. *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962).

5. The factors to be considered by the trial court are:

(a) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue;

(b) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant;

(c) whether the plaintiff has at least a reasonable likelihood of success on the merits; and

(d) whether the granting of a preliminary injunction will disserve the public interest.

*Roper Corporation v. Litton Systems, Inc.,* 757 F.2d 1266 (Fed.Cir.1985).

6. A preliminary injunction will normally issue only for the purpose of preserving the status quo and protecting the respective rights of the parties pending final disposition of the litigation. *Smith International, Inc. v. Hughes Tool Company,* 718 F.2d 1573 (Fed.Cir.1983).

7. The requirements for obtaining a preliminary injunction in a trademark case are generally the same as the requirements in non-trademark cases. *M. Kramer Manufacturing Co. v. Andrews,* 783 F.2d 421, 448 (4th Cir.1986).

### A. *Irreparable Harm*

■ 8. The absence of an available remedy by which the movant can later recover monetary damages may be sufficient to show irreparable injury. *Enterprise Intern. Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464 (5th Cir. 1985).

■ 9. Likelihood of confusion due to the subsequent use of the confusingly similar mark by its very nature causes irreparable harm. *Home Savings of America v. Home Savings Association,* 291 U.S.P.Q. 157, 159 (S.D.Tex.1982).

■ 10. A showing of likelihood of confusion as to source or sponsorship establishes the requisite likelihood of success on the merits as well as risk of irreparable harm. *Canon U.S.A., Inc. v. Saber Sales Corp.,* 220 U.S.P.Q. 1003, 1006 (E.D.N.Y. 1983).

■ 11. Loss of control of the quality of the products, as in the present case, constitutes an irreparable harm to plaintiff. *See American Rice, Inc. v. Arkansas Rice Growers Cooperative Association,* 532 F.Supp. 1376, 1389 (1982), also citing with approval, *Carling Brewing Co. v. Phillip Morris, Inc.,* 277 F.Supp. 326, 335 (N.D.Ga. 1967).

**1392**

### B. *Likelihood of Success*

■ 12. For a plaintiff to bring an action for trade dress infringement under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the use of a confusingly similar trade dress must constitute either a false designation of origin or a false description or representation. *Chevron Chemical Co. v. Voluntary Purchasing Groups,* 659 F.2d 695, 700 (5th Cir.1981).

■ 13. The copying by Defendants of the configuration of the Chemlawn Gun constitutes a "false representation" as defined in § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). This section reads in pertinent part:

### § 1125. False designations of origin and false descriptions forbidden

(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any persons doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) provides a cause of action for trade dress infringement for a party injured by one who sells his goods in such a way as to make it appear that they come from some other source. *Chevron Chemical Co. v. Voluntary Purchasing Groups,* 659 F.2d 695 (5th Cir.1981), *cert. denied,* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982). Plaintiffs may satisfy the jurisdictional requirement of use in interstate commerce pursuant to 15 U.S.C. § 1125(a) by demonstrating:

(1) that the infringing mark, or false designation or misrepresentation, was used in connection with goods in commerce, or

(2) that the Defendants' use, while wholly intrastate, tended to have a substantial effect on the Plaintiffs' business.

*Schroeder v. Lotito,* 577 F.Supp. 708 (D.C. R.I.1983). In the present action, it is undisputed that the Defendants' Mag-P spray gun moves in interstate commerce. (Testimony of Palmer). Moreover, Defendant Palmer acknowledged that the gun is imported into the United States from Brazil and is sold by at least one company, Green Pro, located in New York, and that the Defendants' headquarters located in Texas supplies the guns to Green Pro.

■ 14. Despite the variety of perspectives and terms of art that courts use in analyzing trademark and trade dress cases, the inquiry should be reduced to two basic questions. The first, whether a mark or dress qualifies for protection, encompasses the issues of distinctiveness, secondary meaning, and functionality. The second, whether the protected mark or dress has been infringed, is answered by applying the "digits-of-confusion" test to decide whether a likelihood of confusion exists. *Sicilia Di R. Biebow & Co. v. Cox,* 732 F.2d 417, 425 (5th Cir.1984).

### (1). *Distinctiveness*

■ 15. In the terminology of trademark law, distinctiveness is the capacity of a mark to distinguish a product or service which emanates from one source, from products or services emanating from other sources. *Callman Unfair Comp., Trademarks & Monopolies,* § 18.01 (4th Ed.).

■ 16. The fact that a particular design feature may also be functional does not prevent that design feature from distinguishing the goods or product. Only such design features as are functional and are dictated by utilitarian characteristics are not protected. *Sicilia Di R. Biebow & Co. v. Cox,* 732 F.2d 417 (5th Cir.1984).

### (2). *Functionality*

17. The functionality standard adapted by the Fifth Circuit focuses on the utilitarian nature of a configuration or design, but a design that merely assists in a product or configuration's utility is not functional and may therefore be protected. *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 428–29 (5th Cir.1984).

18. The parts of the Chemlawn Gun were obviously designed to perform their particular functions; however, the specific exterior configuration was arbitrarily selected. It was not necessary to copy the configuration of each of the parts of the Chemlawn gun in order to obtain those functions.

### (3). *Secondary Meaning*

19. The term "secondary meaning" was developed as part of the common law of trademarks. *Chevron Chemical Co. v. Voluntary Purchasing Groups*, 659 F.2d 695, 702 (5th Cir.1981).

20. Trademarks may acquire distinctiveness through extensive use by a single supplier so that the public recognizes the trademarks as identifying the source of the product. That kind of consumer identification is termed "secondary meaning." *Chevron Chemical Co., supra,* at 702.

21. Trademark law requires a demonstration of "secondary meaning" only when the claimed trademark is not sufficiently distinctive of itself to identify the producer. *Chevron, supra,* page 702. The same principles apply to protection of trade dresses as in the instant action. Proof of secondary meaning may be required only when the design or trade dress is not sufficiently distinctive of itself to identify its producer. *Chevron, supra,* page 702.

22. In the action at bar, the evidence produced showed that the Chemlawn Gun has been manufactured exclusively by Chemlawn for over a decade. Thus, even if the features on the Chemlawn Gun could not be deemed inherently distinctive in appearance at the time of its introduction into the lawn care industry, the Chemlawn Gun's long and extensive production would serve to identify it to the industry as a product emanating from Chemlawn.

23. In addition, case law holds that proof of deliberate copying of a product by another establishes a *prima facie* case of secondary meaning sufficient to shift the burden of persuasion to the defendant on that issue. *M. Kramer Manufacturing Co. v. Andrews*, 783 F.2d 421, 448 (4th Cir.1986). In the case *sub judice,* the Defendants failed to present evidence rebutting the presumption on the issue of secondary meaning.

24. The Court finds the continuous manufacture over the past decade by Chemlawn and it subsidiary of the Chemlawn Gun and intentional copying by Defendants would cause it to achieve secondary meaning, and hence, be protectible as a trademark under § 43(a) of the Lanham Act.

### (4). *Likelihood of Confusion*

25. The Fifth Circuit has set out a list of factors called "digits of confusion" which must be applied in weighing the relative likelihood of confusion against a lack of confusion. *Chevron, supra,* at 703; *Sicilia, supra,* at 430. The "digits" to be examined include Defendants' intentions, the similarity of the respective designs, evidence of actual confusion, the similarity of the products, the retail outlets, the purchasers, and the advertising media used. *Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.*, 725 F.2d 336, 345 (5th Cir.1984); *Chevron, supra,* at 703.

26. Courts almost unanimously presume a likelihood of confusion based upon a showing that the defendant intentionally copied the plaintiff's trademark or trade dress. *M. Kramer Manufacturing Co., supra,* footnote 24 at p. 448, citing *2 J. McCarthy, Trademarks and Unfair Competition,* §§ 23:24–:35 (2d Ed. 1984).

27. The Court finds that the Plaintiffs have shown, through an application of the digits of confusion test adopted by this and other circuits, a likelihood of

confusion between Plaintiffs' Chemlawn Gun and Defendants' Mag-P Gun. Moreover, pursuant to settled law the Plaintiffs have also established a likelihood of success on the merits and irreparable harm.

### C. *No Threatened Harm To Defendants*

28. The Court further finds that because Defendants have (1) no interest in the tooling used to produce their Mag-P Gun, (2) no commitment beyond their present purchase orders to buy more of these guns from their manufacturer, (3) only recently added the guns to their produce line, and (4) several other products are in their product line, there is minimal risk of harm to Defendants by the issuance of an injunction. The balancing of equities favors the Plaintiffs, who would be irreparably harmed if an injunction did not issue.

### D. *Public Interest*

29. The Court finds that the public interest is served by enjoining unfair trade practices which occur within the stream of commerce subject to the lawful regulation of Congress and in violation of the Lanham Act.

### V. *Conclusion*

Accordingly, the Court holds that the evidence presented by the Plaintiffs satisfies the requirements enunciated by this Circuit and Rule 65 FED.R.CIV.PRO. for the issuance of a preliminary injunction. Pursuant to Rule 65(c), FED.R.CIV.PRO., the Plaintiffs are directed to post as security a surety bond in the amount of $5,000.00. In the event that circumstances require revision in the amount of the bond, appropriate application to the Court can be made.